AO 91 (Rev. 11/11) Criminal Complaint (approved by AUSA Joseph T. Labrum, III)

# UNITED STATES DISTRICT COURT
for the

Eastern District of Pennsylvania

| | |
|---|---|
| United States of America<br>v.<br>Salvador Villafana<br>Jose Payano<br><br>*Defendant(s)* | )<br>)<br>) Case No. 17-1193<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __August 28-31, 2017__ in the county of __Philadelphia__ in the __Eastern__ District of __Pennsylvania__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to distribute 1 kilogram or more of heroin |
| 21 U.S.C. § 841(a), (b)(1)(A) | Possession with intent to distribute 1 kilogram or more of heroin |

This criminal complaint is based on these facts:
See attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Travis Campbell, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: September 1, 2017

_____
*Judge's signature*

City and state: Philadelphia, PA        Hon. Thomas J. Rueter, U.S. Magistrate Judge
*Printed name and title*

17-1193-AU

## AFFIDAVIT

I, Travis W. Campbell, being duly sworn, depose and say:

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since April 2017. In October 2015, I was assigned to the DEA Philadelphia Field Division. Prior to my employment with the DEA, I was a Special Agent with the North Carolina State Bureau of Investigation/Alcohol Law Enforcement for approximately 5 years.

2. I have specialized training and experience in drug smuggling and distribution investigations, including but not limited to, the means and methods used by traffickers to import and distribute controlled substances, interdiction, smuggling methods, and the concealment and laundering of proceeds from illegal drug trafficking activities. I have participated in numerous narcotics investigations, debriefed or participated in debriefings of hundreds of defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations, and have participated in all aspects of drug investigations, including conducting physical surveillance, analyzing information obtained from court-ordered pen register and trap and trace intercepts, and analyzing telephone toll information obtained as a result of subpoenas issued by the DEA. I have also assisted in numerous wiretap investigations, including monitoring. My training and experience have made me familiar with illegal drug trafficking and the packaging and shipping of controlled substances including heroin, cocaine, cocaine base ("crack"), methamphetamine, and marijuana. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in

vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection. My narcotics training and experience have made me familiar with the methods of illegal trafficking, packaging and shipping of the following controlled substances: cocaine, cocaine base, heroin, and marijuana.

3. My present duties at DEA include investigating narcotics traffickers, seizing narcotics, and identifying and seizing assets representing proceeds of narcotics trafficking. I have specialized training and experience in drug smuggling and distribution investigations, including but not limited to, the means and methods used by traffickers to import and distribute controlled substances, interdiction, smuggling methods, and the concealment and laundering of proceeds from illegal drug trafficking activities. I have participated in numerous narcotics investigations, debriefed or participated in debriefings of hundreds of defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations, and have participated in all aspects of drug investigations, including conducting physical surveillance, analyzing information obtained from court-ordered pen register and trap and trace intercepts, and analyzing telephone toll information obtained as a result of subpoenas issued by the DEA. I have also assisted in numerous wiretap investigations, including monitoring. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection.

4. This affidavit is being submitted in support of a Criminal Complaint and Arrest Warrant for the arrest of SALVADOR VILLAFANA and JOSE LUIS PAYANO on a

2

charge of conspiracy to distribute a controlled substance, namely, more than a kilogram of heroin, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846. As detailed more fully below, VILLAFANA, PAYANO, and others have been involved in the trafficking of heroin in the Philadelphia, New Jersey, and other areas.

5. Since this affidavit is being submitted for the limited purpose of obtaining an arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts I believe are necessary to establish probable cause for the arrest of VILLAFANA and PAYANO on the specific charges of conspiracy to distribute heroin and possession with intent to distribute heroin. In this affidavit, your affiant refers to conversations from telephone calls. With regard to these conversations, several conditions apply. First, some conversations were in the Spanish language. Your affiant does not speak Spanish. However, Spanish translators employed by the DEA have listened to the conversations and prepared English language summaries or transcripts of their content. Second, preliminary summaries and transcripts have been provided to your affiant and other investigative agents by the monitors/translators, but final transcripts have not been prepared and changes to the translations may occur during the preparation of final transcripts. While the summaries and quotations from summaries are preliminary, your affiant believes they accurately reflect the substance of the conversations. Third, the interpretations and analyses of the conversations described below are based upon the training and experience of your affiant and other law enforcement agents involved in this and other drug trafficking investigations.

### FACTS ESTABLISHING PROBABLE CAUSE

6. Since October 2016, Special Agents and Task Force Officers ("TFO") of DEA Philadelphia High Intensity Drug Trafficking Area Group 32 have been investigating the

current drug trafficking activities of VILLAFANA, PAYANO, and others. The investigation included federal Court-authorized wiretaps on cellular telephones utilized by VILLAFANA.

7. On August 28, 2017, pursuant to court authorized intercepted wire communications, investigative agents learned that VILLAFANA arranged to deliver what I believe to be 500 grams of heroin to an unidentified customer in Plainfield, New Jersey. VILLAFANA arranged to have Jose PAYANO drive from Plainfield, New Jersey to receive the 500 grams of heroin from him at 3749 N. Franklin Street, Philadelphia, Pennsylvania. VILLAFANA also requested PAYANO to go to his apartment in Plainfield, New Jersey, and retrieve what is believed to be 93 grams of fentanyl or heroin, and bring the 93 grams to VILLAFANA in Philadelphia, PA. Through the use of court authorized location information for VILLAFANA's telephone, prior physical surveillance of VILLAFANA and PAYANO, and post arrest statements by VILLAFANA, investigative agents have determined VILLAFANA had an apartment at 120 W. 8th Street, Plainfield, New Jersey. Through the use of physical surveillance, court authorized electronic tracking information for PAYANO's vehicle, and video surveillance, investigative agents observed PAYANO travel from Plainfield, New Jersey to 3749 N. Franklin Street, Philadelphia, Pennsylvania. PAYANO entered the residence and remained inside for several hours. After PAYANO exited the residence, electronic tracking information showed PAYANO traveled to 120 W. 8th Street, Plainfield, New Jersey. Investigative agents observed PAYANO drive his vehicle down the driveway to 120 W 8th Street, Plainfield, New Jersey, and park. Investigative agents observed PAYANO carry a black bag inside the apartment building at 734 Park Avenue, Plainfield, New Jersey; when PAYANO departed 734 Park Avenue he was no longer carrying the black bag.

8. On August 29, 2017, pursuant to court authorized intercepted

communications and physical surveillance, investigative agents observed and learned that PAYANO met with an unidentified Hispanic male in Plainfield, New Jersey. Following the meeting with the unidentified Hispanic male, PAYANO contacted VILLAFANA and told him he received what I believe to be $27,500 and that he had been shorted $500. Later that day, investigative agents observed PAYANO travel from Plainfield, New Jersey to 3749 N. Franklin Street, Philadelphia, Pennsylvania. Based on my training, experience, and knowledge of this investigation, I believe that PAYANO met with VILLAFANA inside 3749 N. Franklin Street, Philadelphia, Pennsylvania, on August 28, 2017, as referenced above, at which time he received 500 grams of heroin and transported the heroin to his apartment in Plainfield, New Jersey where he stored the heroin until the following day. I further believe that on August 29, 2017, PAYANO delivered the 500 grams of heroin to the unidentified Hispanic male in Plainfield and received $27,500 in payment. I believe PAYANO then, on the same day, transported the $27,500, representing the proceeds of the sale of the 500 grams of heroin supplied by VILLAFANA, to 3749 N. Franklin Street, Philadelphia, Pennsylvania, at which time he relinquished the money to VILLAFANA.

9. On August 31, 2017, pursuant to court authorized intercepted communications of VILLAFANA's telephones, investigative agents learned that VILLAFANA arranged to meet with an unidentified individual referred to as "Murcielago" in New York. VILLAFANA called PAYANO and arranged for PAYANO to travel to Philadelphia, Pennsylvania, pick him up, and drive him to New York to meet "Murcielago." Through the use of electronic tracking information for PAYANO's vehicle and physical surveillance, investigative agents observed PAYANO travel to Philadelphia and pick up VILLAFANA. Investigative agents then followed PAYANO and VILLAFANA to New York at which time they

5

learned through intercepted communications that VILLAFANA was going to meet "Murcielago" inside an apartment building. Investigative agents observed PAYANO was the only occupant inside his vehicle and was double parked on the street. Investigative agents then intercepted communications between PAYANO and VILLAFANA at which time I believe PAYANO told VILLAFANA there were several uniformed and plainclothes law enforcement officers in the area. I believe VILLAFANA then told PAYANO to leave the area with a female identified as "Patricia" and return at a later time to avoid any detection by law enforcement. Investigative agents observed PAYANO and an unidentified female depart the area in PAYANO's vehicle. PAYANO later returned to the area where VILLAFANA was located and picked him up. Utilizing physical surveillance and court authorized electronic tracking information for PAYANO's vehicle, investigative agents followed PAYANO and VILLAFANA to Philadelphia, Pennsylvania. After arriving in Philadelphia, Pennsylvania, law enforcement stopped PAYANO and VILLAFANA. Pursuant to the vehicle stop, investigative agents located a bag in the front passenger seat floorboard between VILLAFANA's feet. The bag further contained a black plastic bag that contained two brick shaped objects and a smaller chunk. VILLAFANA and PAYANO were arrested and transported to the DEA Philadelphia Field Division for processing.

    10. Investigative agents advised VILLAFANA of his Miranda warnings at which time VILLAFANA waived his rights and spoke with investigative agents. VILLAFANA informed investigative agents that he and PAYANO traveled to New York to meet with an individual he knows as "Murcielago" aka "Polanco" where he received approximately one kilogram of cocaine, approximately 800 grams of heroin, and approximately 150 grams of a substance he would use to mix with heroin. VILLAFANA also advised investigative agents that he utilized an apartment at 120 W 8th Street, Plainfield, New Jersey and had drugs stored there.

VILLAFANA also admitted he had a residence at 3749 N. Franklin Street, Philadelphia, Pennsylvania, and 3916 N. Franklin Street, Philadelphia, Pennsylvania. Investigative agents later executed two federal search warrants at VILLAFANA's two N. Franklin Street residences in Philadelphia, Pennsylvania. Investigative agents located two kilogram presses, numerous baggies containing unknown powder substances, U.S. currency, a drug ledger, and various drug paraphernalia and packaging items. Investigative agents also obtained written consent from VILLAFANA to search his residence at 120 W 8th Street, Apartment A2, Plainfield, New Jersey. During the consent search, investigative agents located a plastic shopping bag weighing in excess of 1 kilogram, containing numerous plastic baggies further containing unknown powder substances suspected to be cocaine and/or heroin. The bag also contained a Sugar House Casino payout slip made out to Jose PAYANO.

11. Based on my training, experience, and knowledge of this investigation, I believe that PAYANO drove VILLAFANA to New York where VILLAFANA obtained approximately one kilogram of cocaine, approximately 800 grams of heroin, and approximately 150 grams of an unknown powder substance from "Murcielago." I further believe that while PAYANO waited inside his vehicle for VILLAFANA to receive the drugs from "Murcielago," that PAYANO called VILLAFANA to warn him about the presence of law enforcement in the area. I believe PAYANO then transported VILLAFANA back to Philadelphia, Pennsylvania with the approximate one kilogram of cocaine, 800 grams of heroin, and 150 grams of the unknown powder substance.

## CONCLUSION

12. Based on the facts related above, your affiant has reason to believe that Salvador VILLAFANA participated in a conspiracy with Jose PAYANO and others, to distribute

a controlled substance, that is, 1 kilogram or more of heroin, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846, and during the course of the events related above possessed with intent to distribute 1 kilogram or more of heroin, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A).

Having signed this affidavit under oath as to all assertions and allegations contained herein, I state that its contents are true and correct to the best of my knowledge, information and belief.

TRAVIS W. CAMPBELL
Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me this 1st day of September 2017

HONORABLE THOMAS J. RUETER
United States Magistrate Judge
Eastern District of Pennsylvania